# In the United States District Court for the Southern District of Georgia Waycross Division

SHAWN WHITESIDE,                    )
                                    )
    Plaintiff,                      )
                                    )
    v.                              )        5:21-CV-62
                                    )
PCC AIRFOILS LLC,                   )
and DANIEL STAPLES,                 )
Individually,                       )
                                    )
    Defendants.                     )

## <u>ORDER</u>

This action is before the Court on Defendants' motion for summary judgment. Dkt. No. 32. For the reasons given below, the motion is **GRANTED**.

## BACKGROUND

Defendant PCC Airfoils LLC ("Defendant PCC" or "PCC") manufactures airfoil casings used in aerospace turbines, procures materials, and molds the materials into parts. Dkt. No. 32-2 ¶ 2; Dkt. No. 37-1 ¶ 2. In 2018, Defendant PCC hired Plaintiff Shawn Whiteside as a Materials Manager at PCC's Douglas, Georgia, location. Dkt. No. 32-2 ¶ 1; Dkt. No. 37-1 ¶ 1; Dkt. No. 32-2 ¶ 4; Dkt. No. 37-1 ¶ 4. As a Materials Manager, Whiteside "was responsible for planning, support, and scheduling of materials at the plant and supervised/managed a team of employees in Defendant

PCC's materials department." Dkt. No. 32-2 ¶ 5; Dkt. No. 37-1 ¶ 5; see also Dkt. No. 32-4 at 50–52 (Materials Manager position description). Whiteside's offer letter stated that he was eligible to participate in PCC's annual Executive Bonus program, where PCC guaranteed minimum payments contingent upon Whiteside's performance, the performance of the Douglas facility, and Whiteside's "continued active employment with PCC on the bonus payment date." Dkt. No. 32-4 at 53. Whiteside is black, and after his hiring he was the only black manager at the Douglas facility. Dkt. No. 37-3 at 117:19–25.

In August 2019, PCC hired Defendant Daniel Staples as its new General Manager. Dkt. No. 32-2 ¶ 10; Dkt. No. 37-1 ¶ 10 (disputing only the exact date PCC hired Staples, not the approximate time frame). Thereafter, Whiteside began reporting to Staples. Dkt. No. 32-2 ¶ 11; Dkt. No. 37-1 ¶ 11. Staples is White. Dkt. No. 27 ¶ 10.

During his time working for Staples, Whiteside alleges that he heard Staples make several racist remarks. Dkt. No. 37-3 at 105:10–106:3, 120:13–19. Specifically, Whiteside alleges that, over the course of his employment, Staples (1) commented that "there were so many black people in the gym," dkt. no. 37-3 at 120:13–19; (2) told Whiteside "I must have some black in me because I like spicy food," id. at 105:11–16; and (3) laughed when a caterer commented that he put a lot of sugar in tea because "the blacks like that" and responded "[w]elcome to the South," id. at

105:18–106:3.

In November 2019, Staples placed a white operations manager, Todd Devore, on a Performance Improvement Plan ("PIP"). See Dkt. No. 37-4 at 139. Staples permitted Devore to draft his own PIP, id. at 59:11–21, 137–38, which included eight goals Devore needed to complete during his review period, id. at 139. Devore's review period lasted from "11/11/19 to 12/11/19" and listed the "time frame for completion" as "12/16/19." Id. at 139–40.

Throughout the review period, Staples documented Devore's failure to meet his PIP goals. Id. at 143–44, 147, 151–56. Because Devore did not show "sufficient improvement," Staples decided to terminate him. Dkt. No. 32-8 ¶ 13. On December 2, 2019—while Devore's review period was ongoing—the local human resources officer, Scott Smith, emailed Leslee Elliott, PCC's Director of Human Resources ("HR"), a first draft of Devore's separation agreement. Dkt. No. 37-4 at 146. Staples fired Devore, the white manager, eight days later, prior to the review period's termination. Id. at 157 (Devore's termination letter dated December 10, 2019).

Around January 2020, Staples placed Whiteside on a PIP, which similarly detailed eight goals for Whiteside to complete. Dkt. No. 37-3 at 191–200. One of the PIP's goals required that Whiteside put in place a "robust" Sales, Inventory, and Operations Planning ("SIOP") template and process. Id. at 191. The PIP stated,

3

"Possible consequences if improvement goals are not met:  Up to and including termination." Id. at 192.  The PIP's title caption stated the "review period" was "1/02/20 to 1/31/20." Id. at 186–87. The PIP's second page contained a separate section titled "[t]ime frame for completion," which was left blank, and another section titled "[f]ollow up review date(s)" which stated "[w]eekly beginning 1/10/20, or more frequently as required." Id. at 187. The fourth page stated that the "[t]ime frame for completion" was "12/16/19" and the "[f]ollow-up review date(s)" were "[w]eekly beginning 11/11/19, or more frequently as required." Id. at 189.

As with Devore's PIP process, Staples documented Whiteside's progress on the PIP. Dkt. No. 32-2 ¶ 45; Dkt. No. 37-1 ¶ 45; Dkt. No. 32-5 at 15–18. Staples's notes reflect that Whiteside completed two of the PIP's requirements, but Staples expressed dissatisfaction with Whiteside's performance on the other requirements and noted that they remained incomplete. Dkt. No. 32-5 at 15–18.

In early February 2020, Staples traveled to Ohio to meet with his supervisor. Dkt. No. 32-2 ¶¶ 50–52; Dkt. No. 37-1 ¶¶ 50–52 (agreeing that Staples traveled to Ohio during that time). On February 5, 2020, Whiteside emailed Elliott to ask if she could call him. Dkt. No. 32-2 ¶ 59; Dkt. No. 37-1 ¶ 59; Dkt. No. 37-6 at 72. Elliott then called Whiteside. Dkt. No. 33-2 ¶ 60; Dkt. No. 37-1 ¶ 60; Dkt. No 37-6 at 71; Dkt. No. 37-6 at 31:25–33:23; Dkt.

No. 37-3 at 111:3–15. Although Elliott disputes that Whiteside ever brought up discrimination on this phone call, for purposes of this motion, we accept Whiteside's version of the call. Dkt. No. 37-6 at 38:4–9 (Elliott denying that Whiteside brought up racial discrimination); Dkt. No. 37-3 at 112:24–113:2 ("What I[, Whiteside,] can recall, my initial comment was to her I'd like to report that I feel I am being racially discriminated against and mistreated on a daily basis by our lead."). According to Whiteside, he told Elliott that Staples had discriminated against him. Dkt. No. 37-3 at 112:24–113:2. After the call, Whiteside emailed Elliott, thanking her for her time and stating that he "expect[ed] [their] conversation today to stay off the record" because his "goal [was] to perform up to [Staples's] expectation and have a long career at PCC." Dkt. No. 32-6 at 9.

Later that day, Elliott, the local human resource officer, called Smith. Dkt. No. 37 at 2; Dkt. No. 37-6 at 36:15–19. The next morning, February 6, 2020, Smith sent Staples an email with the subject line "Shawn Whiteside." Dkt. No. 37-7 at 72. The email message read, "I need to provide you an update." Id. Staples then called and spoke to Smith. Dkt. No. 37 at 3; Dkt. No. 32-2 ¶ 65; Dkt. No. 37-1 ¶ 65. That evening—still one day after Whiteside's complaint—Smith emailed Elliott a copy of Whiteside's separation agreement without copying Staples. Dkt. No. 37-6 at 74. Elliott

responded, providing some thoughts on the letter. Id. at 74–75 (Elliott's February 6 and February 7 email responses).

On February 7, 2020—two days after Whiteside's complaint—Staples terminated Whiteside. Dkt. No. 32-2 ¶ 51; Dkt. No. 37-1 ¶ 51; Dkt. No. 37-5 at 86. Because of his termination, Whiteside did not receive the remainder of his executive bonus. Dkt. No. 32-2 ¶ 55; Dkt. No. 37-1 ¶ 55.

Whiteside subsequently filed suit against PCC and Staples, alleging race discrimination in violation of 42 U.S.C. § 1981 (Count I), dkt. no. 27 §§ 26–39, and retaliation in violation of Section 1981 (Count II), id. §§ 40–47. Whiteside alleges that "Staples intentionally placed [] Whiteside on the PIP in order to avoid paying [] Whiteside his vested bonus based on his race," dkt. no. 27 ¶ 13, and that Whiteside was terminated "in clear retaliation for his protected activity of filing an internal complaint of race discrimination," id. ¶ 25. Defendants PCC and Staples jointly moved for summary judgment pursuant to Federal Rule of Civil Procedure 56. Dkt. No. 32.

## LEGAL STANDARD

Summary judgment "shall" be granted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" where the evidence would allow "a reasonable jury to return a verdict for the nonmoving party."

FindWhat Inv. Grp. v. FindWhat.com, 658 F.3d 1282, 1307 (11th Cir. 2011) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). A fact is "material" only if it "might affect the outcome of the suit under the governing law." Id. (quoting Anderson, 477 U.S. at 248). The Court must view all facts in the light most favorable to the non-moving party and draw all inferences in its favor. Tolan v. Cotton, 572 U.S. 650, 657 (2014).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The movant must show the Court that there is an absence of evidence to support the nonmoving party's case. See id. at 325. If the moving party discharges this burden, the burden shifts to the nonmovant to go beyond the pleadings and present affirmative evidence to show that a genuine issue of fact does exist. See Anderson, 477 U.S. at 257. The nonmovant may satisfy this burden in one of two ways. First, the nonmovant "may show that the record in fact contains supporting evidence, sufficient to withstand a directed verdict motion, which was 'overlooked or ignored' by the moving party, who has thus failed to meet the initial burden of showing an absence of evidence." Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1116 (11th Cir. 1993) (quoting Celotex Corp., 477 U.S. at 332 (Brennan, J., dissenting)). Second, the nonmovant "may come forward with additional evidence sufficient to withstand a directed verdict

motion at trial based on the alleged evidentiary deficiency." <u>Id.</u> at 1117.

**DISCUSSION**

**I.   Defendants are entitled to summary judgment on Whiteside's race discrimination claim.**

"Section 1981 prohibits intentional race discrimination in the making and enforcement of public and private contracts, including employment contracts." <u>Jenkins v. Nell</u>, 26 F.4th 1243, 1249 (11th Cir. 2022) (quoting <u>Ferrill v. Parker Grp., Inc.</u>, 168 F.3d 468, 472 (11th Cir. 1999)). "The elements of a claim of race discrimination under [Section] 1981 are also the same as a Title VII disparate treatment claim in the employment context." <u>Id.</u> (citing <u>Rice-Lamar v. City of Ft. Lauderdale</u>, 232 F.3d 836, 843 n.11 (11th Cir. 2000)). Thus, as with Title VII disparate treatment claims, "[a] plaintiff may use either direct evidence or circumstantial evidence to show race discrimination." <u>Id.</u>

**A. Whiteside does not present direct evidence of discrimination.**

Direct evidence is "evidence which reflects a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee." <u>Damon v. Fleming Supermarkets of Fla., Inc.</u>, 196 F.3d 1354, 1358 (11th Cir. 1999) (internal citations omitted). "In other words, the evidence must indicate that the complained-of employment decision was *motivated*

8

by the decision-maker's [bias]." Id. at 1358–59. "As a result, 'only the most blatant remarks, whose intent could be nothing other than to discriminate . . .' will constitute direct evidence of discrimination." Id. at 1359 (quoting Earley v. Champion Int'l Corp., 907 F.2d 1077, 1081–82 (11th Cir. 1990)). To constitute direct, rather than circumstantial evidence, the evidence must "prove[] the existence of discriminatory intent without inference or presumption." Jefferson v. Sewon Am., Inc., 891 F.3d 911, 921 (11th Cir. 2018) (alterations accepted) (quoting Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1085 (11th Cir. 2004)). "An example of 'direct evidence would be a management memorandum saying, "Fire Earley—he is too old."'" Damon, 196 F.3d at 1359 (quoting Earley, 907 F.2d at 1082).

Staples's racial remarks are not direct evidence of discrimination. While employed as a General Manager at PCC, Staples (1) commented that "there were so many black people in the gym," dkt. no. 37-3 at 120:14–19; (2) told Whiteside "I must have some black in me because I like spicy food," id. at 105:11–16; and (3) laughed and responded, "[w]elcome to the South" after a caterer commented that he had put a lot of sugar in the tea because "the blacks like that," id. at 105:18–106:3.

While these are racial remarks, the comments do not show that Whiteside's termination "was *motivated*" by Staples's bias. Damon, 196 F.3d at 1358–59. Unlike the example "Fire Early—he is too old,"

Staples's comments are uncoupled from Whiteside's termination. Staples did not make these comments while discussing the performance or continued employment of either Whiteside or any other black worker. Further, to constitute direct evidence, the comments must show that Staples fired Whiteside because of this racial bias without the need for any inferences. Here, the jury would need to infer from Staples's comments that he is biased against black people and that this bias motivated his decision to terminate Whiteside. Thus, Staples's comments do not constitute direct evidence of discrimination.

### B. Whiteside does not present circumstantial evidence of discrimination.

The McDonnell Douglas framework generally governs use of circumstantial evidence in employment discrimination cases. See McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Under the McDonnell Douglas framework, the plaintiff has the burden of establishing a prima facie case of race discrimination. Jenkins, 26 F.4th at 1249. To establish a prima facie case, the plaintiff must show: "(1) he belongs to a protected class; (2) he suffered an adverse employment action; (3) he was qualified to perform the job in question; and (4) his employer treated 'similarly situated' employees outside his class more favorably." Id. (citing Lewis v. Union City, 918 F.3d 1213, 1220-21 (11th Cir. 2019) (Lewis I));

see also Lewis I, 918 F.3d at 1224 (confirming that "a meaningful comparator analysis must remain part of the *prima facie* case").

Even if a plaintiff fails to satisfy the McDonnell Douglas framework, "an employee can still survive summary judgment by presenting 'circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent.'" Jenkins, 26 F.4th at 1250 (quoting Smith v. Lockheed-Martin Corp., 644 F.3d 1321, 1328 (11th Cir. 2011)). "A triable issue of fact exists if the record, viewed in a light most favorable to the plaintiff, presents a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." Id. (quoting Smith, 644 F.3d at 1328). "A plaintiff may establish a convincing mosaic by pointing to evidence that demonstrates, among other things, (1) suspicious timing, ambiguous statements, or other information from which discriminatory intent may be inferred, (2) 'systematically better treatment of similarly situated employees,' and (3) pretext." Id. (quoting Lewis v. Union City, 934 F.3d 1169, 1185 (11th Cir. 2019) (Lewis II)). Once a plaintiff establishes a prima facie case of race discrimination, the burden shifts "to the employer to articulate some legitimate, nondiscriminatory reason for the employee's rejection." McDonnell Douglas, 411 U.S. at 802. "[S]hould the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered

11

by the defendant were not its true reasons, but were a pretext for discrimination." Tex. Dep't of Cmty. Affs. v. Burdine, 450 U.S. 248, 253 (1981) (citing McDonnell Douglas, 411 U.S. at 804).

i. **Whiteside does not show that Staples treated Devore more favorably.**

The parties dispute McDonell Douglas's fourth prong, which requires a plaintiff to show "his employer treated 'similarly situated' employees outside his class more favorably." Jenkins, 26 F.4th at 1249; Dkt. No. 32-1 at 7-8; Dkt. No. 37 at 20-25. Here, Plaintiff offers Devore, who is white, as a comparator. Dkt. No. 37 at 16-17. The parties do not dispute that Devore and Whiteside are similar in all material respects as required for a comparator analysis—they dispute only whether Staples treated Devore more favorably than Whiteside. Dkt. No. 32-1 at 7-8; Dkt. No. 37 at 20-25. If Whiteside fails to show that Staples treated Devore "more favorably," then Whiteside fails to present his prima facie case under McDonnell Douglas.

Whiteside argues that Staples treated Devore more favorably in a variety of ways. Dkt. No. 37 at 20-25. According to Whiteside, (1) Staples permitted Devore to draft his own PIP and review it with Smith, but Staples did not permit Whiteside to do so; (2) Devore's PIP set out clear expectations for his performance, while Whiteside's did not and included arbitrary scrutiny of the SIOP program; (3) Staples met regularly with Devore but not with

Whiteside to discuss the PIPs;[1] and (4) human resources monitored Devore's PIP for "fairness," but they did not similarly monitor Whiteside's PIP. Id. These arguments fail.

The Eleventh Circuit has repeatedly admonished that "[f]ederal courts do not sit as a super-personnel department that reexamines an entity's business decisions." Lewis v. Ga. Power Co., No. 22-11395, 2023 WL 1818924, at *3 (11th Cir. Feb. 8, 2023) (quoting Chapman v. AI Transp., 229 F.3d 1012, 1030 (11th Cir. 2000)); see also Cheatwood v. City of Vestavia Hills, No. 21-13680, 2022 WL 2921304, at *1 (11th Cir. July 26, 2022) (citing Alvarez v. Royal Atl. Devs., Inc., 610 F.3d 1253, 1266 (11th Cir. 2010)); Gogel v. Kia Motors Mfg. of Ga., Inc., 967 F.3d 1121, 1142–43 (11th Cir. 2020) (quoting Elrod v. Sears, Roebuck & Co., 939 F.2d 1466, 1470 (11th Cir. 1991)). Instead, to determine whether a comparator was treated more favorably, courts in this circuit examine the material differences between the plaintiff and comparator's treatment that are capable of evaluation by a court without personnel or industry expertise—such as whether they were both cited for misconduct, investigated, reprimanded, terminated,

---

[1] The parties dispute whether Staples ever met with Whiteside during the review period or whether Whiteside was aware of the contents of Staples's notes. Dkt. No. 32-2 ¶¶ 44–45; Dkt. No. 37-1 ¶¶ 44-45. Drawing inferences in Whiteside's favor, for purposes of this motion the Court assumes the parties did not meet and Whiteside did not know the contents of the notes.

and provided the same opportunities at severance. See Mango v. Mitchell Cnty., No. 1:14-CV-00049, 2016 WL 4697345, at *4 (M.D. Ga. Sept. 7, 2016) ("Plaintiff's argument is essentially that the two white employees were fired for legitimate misconduct, while he was fired for less egregious conduct. Courts, however, are to refrain from 'second guessing employer's reasonable decisions and confusing apples with oranges.' . . . As they were also fired, and Plaintiff has presented no evidence that the terms of severance were more favorable for the two comparators, he has failed to make a prima facie case for disparate treatment.")(citation omitted); Baker v. Cont'l Aerospace Techs., Inc., No. 1:21-CV-00004-C, 2021 WL 6050437, at *5 (S.D. Ala. June 9, 2021) (finding that the alleged comparator "was not treated differently because his employment was also terminated by [the defendant] for performance issues"); Washington v. United Parcel Serv., Inc., 567 F. App'x 749, 752 (11th Cir. 2014) (holding that two individuals, who were fired for integrity issues, were not treated better than the plaintiff, who was also fired for integrity violations ); Holifield v. Reno, 115 F.3d 1555, 1562-63 (11th Cir. 1997), abrogated on other grounds by Lewis I, 918 F.3d at 1213 (finding that the alleged comparator was not treated more favorably even though he was transferred rather than terminated because the defendant also attempted to transfer the plaintiff before she was terminated, but no opportunity to transfer was available); Whitehurst v. Liquid

Env't Sols., Inc., 45 F. Supp. 3d 1328, 1346 (M.D. Fla. 2014) (holding that the alleged comparators were treated "exactly the same" as the plaintiff because the defendant terminated all of them). Courts do not examine the diminutive differences that lie within the employer's reasonable discretion—such as whether the comparator's conduct was "less egregious" than the plaintiff's conduct. Mango, 2016 WL 4697345, at *4.

The Court is no expert in personnel management or the manufacturing of airfoil casings. As such, it is in no position to second-guess PCC's discretionary business-decisions in the minute details of creating and monitoring the PIPs or the granular details of evaluating employees' performance under the PIPs. The Court will therefore not inquire into the discretionary minutia of (1) whether "Whiteside's PIP did not clearly let him know what was required, had subjective indicators, . . . did not provide realistic deadlines, [or] had unattainable requirements involving SIOP and other managers' duties," dkt. no. 37 at 21; (2) whether Staples treated Whiteside less favorably because Staples did not meet regularly with Whiteside to discuss his PIP and never showed Whiteside his PIP notes, id. at 21–22; (3) whether Elliott and Smith communicating for two weeks about Devore's termination made his termination more "fair" or otherwise benefitted Devore, id. at 23; (4) or whether Staples over-scrutinized Whiteside regarding the SIOP process, id. at 23–25. These arguments all implicate small

15

aspects of Defendants' business judgments which the Court has neither the expertise nor the authority to critique. This case provides an excellent example of the reason the Eleventh Circuit requires courts to refrain from serving as "super-personnel departments." See, e.g., Lewis, 2023 WL 1818924, at *3 (quoting Chapman, 229 F.3d at 1030). One could imagine a confusing, time-soaked trial at which a lay jury struggles to appreciate the proper amount of time and effort a manager should scrutinize an employee regarding an SIOP process in an airfoils casing plant.

Here, the undisputed evidence shows that Staples treated Devore and Whiteside similarly in all material respects, conducting materially the same disciplinary process against each one. The end result was the same for the white man and the black man, the plaintiff and comparator. In contrast, in Scott v. Sarasota Doctors Hospital, Inc., 145 F. Supp. 3d 1114, 1121, 1125 (M.D. Fla. 2015), aff'd, 688 F. App'x 878 (11th Cir. 2017), the court held that a comparator was treated more favorably because he "received counseling, was sent to anger management classes, and, after all of these attempts failed, provided a ninety-day termination notice," while the plaintiff was simply fired without receiving the option for counseling or anger management classes. Unlike in Scott, both Devore and Whiteside received the same resource in response to their poor performance: placement on a PIP. Instead, this case is more like Howard v. Hyundai Motor

_Manufacturing Alabama_, 754 F. App'x 798, 806–07 (11th Cir. 2018) (nonbinding), where the court found that the defendant did not treat the comparator more favorably because the defendant investigated both the plaintiff and the alleged comparator's behavior, created detailed memoranda containing its findings, and fired them both. Like the _Howard_ defendant that conducted the same material disciplinary steps against the plaintiff and the alleged comparator, Staples determined that both Devore and Whiteside performed poorly, placed them both on PIPs, documented his beliefs that they failed to satisfy the PIPs, and terminated them both. Dkt. No. 37-4 at 151–65; Dkt. No. 37-3 at 186–200; Dkt. No. 37-5 at 86–91. Thus, Staples and PCC treated Devore and Whiteside similarly in all respects the Court is permitted and equipped to consider.

Some evidence actually indicates that Whiteside was treated more favorably than Devore. Devore was fired _before_ the "review period" listed at the top of his PIP ended, about four weeks after he started his PIP. Dkt. No. 37-4 at 139–40, 157. Defendants exchanged drafts of Devore's termination agreement over a week before they fired him, so Devore only spent three full weeks on his PIP before Defendants decided to fire him. Dkt. No. 37-4 at 146. In contrast, Whiteside was fired _after_ the "review period" listed at the top of his PIP ended, about five weeks after he started his PIP. Dkt. No. 37-3 at 191–192; Dkt. No. 37-5 at 86.

17

Even assuming, like Staples testified, that he decided to terminate Whiteside around January 31, 2020, this means Whiteside had four weeks to progress towards his PIP goals—while Devore only had three—before Staples decided to fire him. Dkt. No. 32-8 ¶ 11; Cf. Anderson v. Dunbar Armored, Inc., 678 F. Supp. 2d 1280, 1309 (N.D. Ga. 2009) (noting that defendant actually treated the plaintiff more favorably than the alleged comparator because the plaintiff was granted approximately twenty-six weeks of medical leave, while the alleged comparator was granted twelve weeks). As such, Whiteside fails to point to another comparator who was treated "more favorably" as required to present a prima facie case of race discrimination under McDonnell Douglas. Jenkins, 26 F.4th at 1249. Because Whiteside fails to establish a prima facie case of race discrimination, Whiteside must present a "convincing mosaic" of circumstantial evidence that would allow a jury to infer discriminatory intent to avoid dismissal of his claim. Id. at 1250.

**ii. Whiteside fails to present a convincing mosaic of circumstantial evidence.**

As discussed, a plaintiff may also survive summary judgment by presenting "a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." Id. at 1250 (quoting Smith, 644 F.3d at 1328). "A plaintiff may establish a convincing mosaic by pointing to evidence that demonstrates, among other things, (1) suspicious timing,

ambiguous statements, or other information from which discriminatory intent may be inferred, (2) 'systematically better treatment of similarly situated employees,' and (3) pretext." Id. (quoting Lewis II, 934 F.3d at 1185). Whiteside successfully shows ambiguous statements that raise an inference of Staples's bias, but he fails to present other relevant evidence, such as suspicious timing, systematic better treatment of other employees, or pretext. While none of these types of evidence are required to show a "convincing mosaic," Whiteside must present more evidence regarding Staples's statements to prevail on his claim. Jenkins, 26 F.4th at 1250.

### 1. Staples's comments raise an inference of discriminatory motive.

Staples's comments, if proven, would allow a jury to infer racial bias that could have motivated his decision to terminate Whiteside. Dkt. No. 37-3 at 105:10–106:3, 120:14–19. These comments support an "inference of discrimination" even though "the comments were not made close to the termination decision and were too remote in time or too attenuated to constitute direct evidence of discrimination." Jenkins, 26 F.4th at 1251. Without more, however, the comments do not allow Whiteside's claim to survive summary judgment due to the following considerations.

**2. *Whiteside does not present evidence of systematic better treatment of similarly situated employees.***

Apart from failing to present a comparator who Staples treated more favorably, Whiteside does not present evidence of "systematically better treatment of similarly situated employees." Id. at 1250 (quoting Lewis II, 934 F.3d at 1185).

**3. *Whiteside does not show that Defendants' nondiscriminatory explanation is pretext.***

Whiteside fails to show pretext for his race discrimination claim. Whiteside's evidence related to discrimination fails to undermine Defendants' legitimate, nondiscriminatory reason for Whiteside's termination: his deficient performance. Dkt. No. 32-1 at 1, 4, 9 ("Defendants . . . had a legitimate, non-discriminatory reason for Plaintiff's placement on the PIP and termination, namely, Plaintiff's deficient performance."); Dkt. No. 37-5 at 98–102 (recording Whiteside's failure to meet his PIP goals); see also Jackson v. State of Ala. State Tenure Comm'n, 405 F.3d 1276, 1289 (11th Cir. 2005) (discussing the McDonnell Douglas analysis but defining pretext).

To show pretext, a plaintiff must "demonstrate that the proffered reason was not the true reason for the employment decision," either "directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is

unworthy of credence." Id. (quoting Burdine, 450 U.S. at 256). A plaintiff may show pretext by "demonstrat[ing] such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." Jackson, 405 F.3d at 1289 (quoting Combs v. Plantation Patterns, 106 F.3d 1519, 1538 (11th Cir. 1997)). Further, "[p]rovided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason." Chapman, 229 F.3d at 1030.

"The inquiry into pretext centers on the employer's beliefs, not the employee's beliefs and, to be blunt about it, not on reality as it exists outside of the decision maker's head." Alvarez, 610 F.3d at 1266. The Court must determine, therefore, whether Staples was dissatisfied with Whiteside due to his poor performance, "even if mistakenly or unfairly so," or whether he merely used that excuse to cover his discriminatory motive. Id. When determining whether a defendant's explanation is pretext, courts "must be careful not to allow . . . plaintiffs simply to litigate whether they are, in fact, good employees." Id. (quoting Rojas v. Florida, 285 F.3d 1339, 1342 (11th Cir. 2002)). The Court must not resolve "the wisdom or accuracy" of Staples's decision

that Whiteside did not perform his job well "or whether the decision to fire h[im] was 'prudent or fair.'" Id. Like Title VII, Section 1981 "does not require the employer's needs and expectations to be objectively reasonable; it simply prohibits the employer from discriminating" on the basis of race. Id.

Whiteside urges that Defendants' explanation is mere pretext by pointing to (1) the completion date on the PIP, which states a date that passed before Whiteside was placed on the PIP; (2) Whiteside's testimony that he and Staples had discussed the fluidity of the PIP's objectives; and (3) that Staples left him in charge of the plant when he traveled to Ohio. See generally Dkt. No. 37 (arguing Defendants' explanation is pretext for retaliation and then arguing Whiteside has presented sufficient evidence of race discrimination).

None of these arguments succeed. As Whiteside himself admits, he did not meet all his PIP goals. Dkt. No. 37 at 21 (admitting that Whiteside achieved only "six (6) of the eight (8) clear attainable requirements of the PIP"); Dkt. No. 37-3 at 195-99 (providing feedback on Whiteside's PIP progress); Dkt. No. 32-1 at 3-4 ("Staples' notes reflect that Plaintiff met some of the PIP's expectations, but struggled to show progress in several key areas. For example, two weeks into the PIP, Plaintiff had done 'little to no work' on the SIOP plan, and he had failed to create a line of sight plan for the facility."). Staples's notes show that he

subjectively believed that Whiteside did not perform his job well and did not meet the PIP's goals. Dkt. No. 37-3 at 195–99. None of Defendants' contentions undermine this evidence. See Alvarez, 610 F.3d at 1266 (holding that the plaintiff's argument that "she did her job as well as could reasonably be expected" "is no different from arguing that [the decisionmaker] should have been satisfied with [the plaintiff's] performance, or that it is unfair for her not to have been satisfied," which was not relevant to the analysis).

As Whiteside notes, Defendants' assertion that the PIP had expired conflicts with ambiguous dates on the PIP and Whiteside's testimony. Dkt. No. 32-2 ¶ 49 (Defendants asserting that the PIP expired on January 31, 2020); Dkt. No. 37-1 ¶ 49 (Whiteside denying that the PIP expired on that date); Dkt. No. 32-8 ¶ 11 (Staples's affidavit asserting that the PIP expired); Dkt. No. 40 at 18 ("Plaintiff's assertion that the PIP did not expire on January 31 because the word 'expire' is not included in the document is unpersuasive."); Dkt. No. 37 at 18 ("Throughout the entire PIP, there is no mention at all of it expiring."); Dkt. No. 37-3 at 103:1-24 (Whiteside testifying that he and Staples discussed the "fluidity" of the action items on the PIP, rather than the PIP expiring). Nevertheless, terminating Whiteside before the expiration of his PIP or after Staples had discussed the "fluidity" of the PIP—even if doing so was unfair or violated company policy-

23

(1) does not undermine evidence that Staples believed Whiteside performed his job poorly or (2) indicate that *race* more likely motivated Staples to terminate Whiteside. See Alvarez, 610 F.3d at 1266 ("Title VII does not require the employer's needs and expectations to be objectively reasonable; it simply prohibits the employer from discriminating on the basis of membership in a protected class."); Springer v. Convergys Customer Mgmt. Grp. Inc., 509 F.3d 1344, 1350 (11th Cir. 2007) ("[E]ven where preselection violates corporate personnel policies, it does not necessarily indicate racial discrimination."); Holley v. Ga. Dep't of Corr., 845 F. App'x 886, 891 (11th Cir. 2021) (holding that the defendant Department of Corrections' violation of its own policy did not provide evidence of pretext because the plaintiff had a criminal record that the decisionmaker subjectively believed fell below the department's standards). That Devore, the white manager, was fired prior to the termination of his PIP's "review period" and "time frame for completion" further supports this conclusion. See Dkt. No. 37-4 at 139–40, 157. This evidence thus fails to show that Defendants' proffered explanation is pretext.

Similarly, that Staples left Whiteside in charge of the plant does not indicate that Staples believed Whiteside was performing well. Dkt. No. 37 at 19. In fact, there is evidence to the contrary, because Staples recorded his dissatisfaction with Whiteside's performance on his PIP. Dkt. No. 37-3 at 195–99. Staples could

have left Whiteside in charge for a multitude of reasons even if he was dissatisfied with Whiteside's job performance—inferring that he did so because he was satisfied with Whiteside's performance when concrete evidence points to the contrary would be speculation. As discussed, courts do not sit as a "super-personnel department," and this Court will not second-guess the wisdom of Defendant's business decisions, such as leaving Whiteside in charge of the plant and later terminating him. Alvarez, 610 F.3d at 1266. Thus, this does not contribute to a finding of pretext.

> a. **The timing in this case does not indicate discriminatory motive.**

To consider all possible sources of circumstantial evidence in this case, the Court also examines the timing at issue. See Jenkins, 26 F.4th at 1250 (explaining that "suspicious timing" may contribute to a finding of a convincing mosaic of circumstantial evidence). Here, Defendants drafted a copy of Whiteside's separation agreement on day after he complained of race discrimination and fired him two days after his complaint. Dkt. No. 37-3 at 112:24–113:2; Dkt. No. 32-6 at 9; Dkt. No. 37-6 at 74; Dkt. No. 37-5 at 86. The timing in this case, however, does not indicate *discriminatory* intent; the temporal proximity between Whiteside's complaint and his termination does not indicate that race, rather than the complaint itself, motivated Staples. Harris v. Jackson, No. 1:19-CV-5849-MLB, 2022 WL 4596343, at *9 (N.D. Ga.

Sept. 30, 2022) (agreeing with the magistrate judge's "finding
that the conduct [the plaintiff] relie[d] on suggests only a
retaliatory—but not discriminatory—motive"). For these reasons,
the evidence in this case does not raise a plausible inference
that Staples's proffered nondiscriminatory explanation was mere
pretext.

### b. The rest of Whiteside's arguments fail.

Whiteside's remaining arguments fail because whether the PIP
process or its requirements were unfair, "subjective," or
"unattainable" does not undermine Staples's belief that Whiteside
performed poorly. Dkt. No. 37 at 2 (urging that Staples
"subjective[ly]" applied the PIP policy and included unattainable
goals); id. at 5 (discussing "the unequal treatment received and
subjective application under the unwritten or non-existent PIP
policy and the unattainable goals that could not be accomplished
within the time frames or without assistance from other members of
management"); id. at 21 ("Whiteside's PIP did not clearly let him
know what was required, had subjective indicators, importantly did
not provide realistic deadlines, had unattainable requirements
involving SIOP and other managers' duties, and did not include
fairness his Caucasian coworker Devore experienced."); id. at 23–
24 (arguing that Staples arbitrarily scrutinized Whiteside for the
SIOP process); Dkt. No. 42 at 2 (discussing the "subjective
application" of the PIP and the PIP's "unattainable goals").  This

same logic also applies to whether Whiteside objectively completed the PIP's requirements or performed his job well. <u>See</u> Dkt. No. 37 at 19 (arguing that Whiteside's performance was improving); <u>id.</u> at 23–25 (urging that Whiteside could have completed the SIOP process in one week had he received the correct instruction).

### c. **Whiteside does not produce enough evidence to create a "convincing mosaic."**

For the aforementioned reasons, Whiteside successfully presents as circumstantial evidence of discrimination Staples's three comments, as well as his own testimony that he felt discriminated against. <u>See</u> Dkt. No. 37-3 at 105:10–106:3, 106:8–15, 120:14–19, 121:11–22:3; <u>but cf.</u> <u>Webb v. R&B Holding Co.</u>, 992 F. Supp. 1382, 1388 (S.D. Fla. 1998) ("Plaintiff's subjective belief that other employees were treated more favorably than she does not show that Defendant's business reason was pretextual."). Courts in the Eleventh Circuit require significantly more evidence to conclude that a plaintiff has presented a convincing mosaic. In <u>Jenkins</u>, for example, the Eleventh Circuit found a "convincing mosaic" of racial discrimination when the white plaintiff presented evidence (1) the plaintiff committed the same violation as another non-white employee who remained employed; (2) eighteen employees left the department after the defendant took over; (3) the defendant mistreated three other white employees; (4) the defendant had a close relationship with HR; (5) the defendant made

racially-biased comments about white employees; (6) the plaintiff declined to change an accident report after the defendant asked him to do so; and (7) the defendant presented "shifting reasons for terminating [the plaintiff]." 26 F.4th at 1250-51.

Further, in Smith, the court found a convincing mosaic where the plaintiff presented evidence that the defendants had a motive to discriminate, the defendants had treated black and white employees differently on several occasions, and the employer tracked race while making disciplinary decisions. 644 F.3d at 1328-46. In contrast, Staples's comments and Whiteside's own testimony that Staples treated him worse due to his race are the only probative circumstantial evidence in this case. Cf. Webb, 992 F. Supp. at 1388 ("Plaintiff's subjective belief that other employees were treated more favorably than she does not show that Defendant's business reason was pretextual."). This is far less evidence than in Jenkins or Smith.

Without more, this evidence is insufficient to create a convincing mosaic of discrimination because it would not permit a reasonable jury to infer intentional discrimination by Staples. See Holley, 845 F. App'x at 891 (declining to find a "convincing mosaic" where the plaintiff presented no evidence that the defendant's proffered reasons were pretext and the objective evidence supported the defendant's proffered reason); Moultrie v. Ga. Dep't of Corr., 703 F. App'x 900, 907 (11th Cir. 2017) (finding

28

no convincing mosaic where the plaintiff's evidence was weaker than the plaintiff's evidence in <u>Smith</u>, 644 F.3d at 1321); <u>Woodward v. Jim Hudson Luxury Cars, Inc.</u>, No. CV 118-032, 2019 WL 4793058, at *8 (S.D. Ga. Sept. 30, 2019) ("The convincing mosaic theory is not intended to undermine the usual requirement of an identified comparator. The evidence presented under the 'convincing mosaic' must be sufficient enough 'to overcome the lack of comparator evidence.'" (citations omitted)).

For these reasons, Defendants' motion for summary judgment is **GRANTED** as to Plaintiff's Section 1981 race discrimination claim.

## II. **Defendants are entitled to summary judgment on Whiteside's retaliation claim.**

"To establish a claim of retaliation under Title VII or section 1981, a plaintiff must prove that [1] he engaged in statutorily protected activity, [2] he suffered a materially adverse action, and [3] there was some causal relation between the two events." <u>Goldsmith v. Bagby Elevator Co.</u>, 513 F.3d 1261, 1277 (11th Cir. 2008); <u>accord</u> <u>Hampton v. Amedisys Ga., LLC</u>, No. 22-11275, 2023 WL 152193, at *3 (11th Cir. Jan. 11, 2023) ("A retaliation claim based on circumstantial evidence is also analyzed under the <u>McDonnell Douglas</u> burden-shifting framework."). To satisfy the causation requirement, a plaintiff must show that his "protected activity was a but-for cause of the alleged adverse action by the employer." <u>Gogel</u>, 967 F.3d at 1135. Phrased

differently, "a plaintiff must prove that *but for* the protected conduct, the defendant would not have taken the particular action." Id. at 1135 n.13.

Once the plaintiff establishes his prima facie case, "[t]he burden of production then shifts to the employer to rebut the presumption by articulating a legitimate, non-discriminatory reason for the employment action." Id. at 1135. After the employer articulates a reason, "the presumption is rebutted, and the plaintiff must then demonstrate that the 'proffered reason was merely a pretext to mask retaliatory actions.'" Id. (alterations accepted) (quoting Bryant v. Jones, 575 F.3d 1281, 1308 (11th Cir. 2009)).

To prevail on a retaliation claim, "[t]he employee need not prove the underlying claim of discrimination which led to her protest." Tipton v. Canadian Imperial Bank of Com., 872 F.2d 1491, 1494 (11th Cir. 1989). "Instead, an employee's opposition to discrimination is protected if she could reasonably form a good faith belief that the discrimination in fact existed." Id. Nevertheless, "[i]mportantly, throughout this entire process, the ultimate burden of persuasion remains on the employee." Sims v. MVM, Inc., 704 F.3d 1327, 1333 (11th Cir. 2013).

Defendants do not dispute that Whiteside experienced a materially adverse action. See Dkt. No. 32-1 at 13-17 (disputing only that Whiteside engaged in protected activity, that there was

a causal connection, and that there was pretext). Further,
Whiteside presents enough evidence to establish on summary
judgment that he engaged in protected activity and that there was
a causal relation between his complaint and his termination.
Whiteside's claim fails, however, because he cannot show pretext.

### A. Whiteside engaged in statutorily protected activity.

Whiteside's testimony that he complained of racial
discrimination when he called Elliott is sufficient to create a
genuine issue of material fact. See Dkt. No. 37-3 at 106:8-15,
112:24-113:2. Defendants argue that Whiteside, contrary to his own
testimony, did not speak with Elliott about race discrimination
when he called her. Dkt. No. 32-1 at 14 (citing Staples's and
Smith's testimony); Dkt. No. 37-3 at 106:8-15, 112:24-113:2
(Whiteside testifying that he complained of race discrimination);
Dkt. No. 37-6 at 38:4-9, 38:21-40:1 (Elliott testifying that she
and Whiteside did not discuss racial discrimination). Instead,
Defendants argue that Whiteside and Elliott discussed only
Whiteside's PIP. Dkt. No. 32-1 at 14. On summary judgment, the
Court must credit Whiteside's testimony. This competing evidence
is sufficient to create an issue of material fact because this is
the kind of he-said she-said evidence that requires a credibility
determination by the jury.

**B. *Whiteside establishes causation.***

To show causation, "a plaintiff must generally establish that the decision-maker 'was actually aware of the protected expression at the time it took adverse employment action.'" Clover v. Total Sys. Servs., Inc., 176 F.3d 1346, 1354 (quoting Goldsmith, 996 F.2d at 1163). "After all, a 'decision maker cannot have been motivated to retaliate by something unknown to him,' whether or not the two events happened close in time." Martin v. Fin. Asset Mgmt. Sys., Inc., 959 F.3d 1048, 1054 (11th Cir. 2020). "That awareness, like most issues of fact, can be established through circumstantial evidence—but not by unsupported inference." Id. at 1053. While a plaintiff may establish causation through circumstantial evidence, "temporal proximity alone is insufficient to create a genuine issue of fact as to causal connection where there is unrebutted evidence that the decision maker did not have knowledge that the employee engaged in protected conduct." Brungart v. BellSouth Telecomms., Inc., 231 F.3d 791, 799 (11th Cir. 2000); Gogel, 967 F.3d at 1137 n.15 ("While close temporal proximity between the protected conduct and the adverse employment action can establish pretext when coupled with other evidence, temporal proximity alone is insufficient.").

Whiteside concedes he does not have direct evidence that Staples knew about his complaint. Dkt. No. 37 at 5-8. Instead, he argues the circumstantial evidence shows that Staples knew

Whiteside had complained to Elliott. Id. As circumstantial evidence of knowledge, Whiteside points to the following communications.

First, Whiteside notes the communication from Elliott to Smith on February 5, 2020, the day of Whiteside's complaint. Id. at 5. As discussed, taking inferences in favor of Whiteside, Whiteside complained to Elliott about race discrimination.

Second, Whiteside points to the phone call between Elliott and Smith the evening after Whiteside's complaint. Id. at 5–6. Elliott and Smith initially denied speaking that evening, but phone records impeach this testimony, showing that Elliott called Smith at 6:11 p.m. and spoke with him for eleven minutes. Id. at 6 (first citing Dkt. No. 37-6 at 36:15–37:19; and then citing Dkt. No. 37-5 at 78). Additionally, Elliott admitted that if Whiteside had complained of race discrimination, she would have called Smith to discuss the complaint. Id. Thus, because the Court must assume Whiteside complained to Elliott about race discrimination, Elliott's phone call to Smith a few hours after Whiteside's complaint—while insufficient on its own—contributes to an inference that Elliott told Smith about Whiteside's complaint. This inference is further supported by the next communication Whiteside highlights.

Third is the communication from Smith to Staples on February 6, 2020. Id. at 6-7. The morning after Whiteside lodged his

complaint and Elliott spoke to Smith, Smith emailed Staples. Dkt. No. 37-7 at 72. The email subject line read "Whiteside" and the email body stated, "I need to provide you an update." Id.; Dkt. No. 37 at 7.

The email subject line indicates that the parties discussed Whiteside, and the body of the email indicates that Smith had something new about Whiteside to tell Staples. See Dkt. No. 37-7 at 72. Staples testified that he would often tell Smith and Elliott about disciplinary actions he had taken to see whether he was acting correctly "from a legal ethical moral standpoint." Dkt. No. 37-7 at 10:5-11:19. As a result, Staples would update Smith about Whiteside's PIP performance, but Smith would not update Staples about it. Id.; Dkt. No. 37 at 6-7. Staples's testimony indicates that Smith "needed to provide" Staples a new HR-related, rather than performance-related, update about Whiteside. This, when combined with the close temporal proximity between Whiteside's complaint and Smith's email, as discussed below, could raise a reasonable inference that Elliott told Smith and Smith told Staples about Whiteside's complaint.

Fourth, Whiteside emphasizes the email from Smith to Elliott containing Whiteside's separation agreement sent on February 6, 2020, the day after Whiteside's complaint. Dkt. No. 37 at 7-8. Elliott denied discussing Whiteside's termination during her phone call with Smith, but Whiteside highlights that Elliott did not

34

express any surprise or confusion upon receiving the separation agreement. Id. at 3; Dkt. No. 37-6 at 44:10-45:2. Moreover, Defendants do not present evidence outside of Staples's own testimony to support that he planned to terminate Whiteside prior to February 6, 2020. Dkt. No. 32-8 ¶ 11 (Staples's affidavit stating he made the decision to terminate Whiteside around January 31, 2020); see generally Dkt. No. 32; Dkt. No. 40. This stands in contrast with evidence that Smith and Elliott discussed Devore's termination weeks before he was actually terminated. Dkt. No. 37 at 16. This evidence, however, is not probative of Staples's knowledge. Whether Elliott would have responded with surprise if she had not discussed Whiteside's termination during her phone call with Smith and if Smith had not told Staples about Whiteside's complaint is pure speculation.

While Elliott's response to seeing Whiteside's termination is not probative of Smith or Staples's knowledge, the proximity between Whiteside's complaint and his termination contributes to an inference of retaliation. Staples testified that he decided to terminate Whiteside around January 31, 2020 but he did not fire Whiteside until a week later—on February 7, 2020. See Dkt. No. 32-8 ¶ 11. In contrast, Whiteside complained that Staples racially discriminated against him on February 5, Smith prepared Whiteside's separation agreement on February 6 (the next day), and Staples officially fired Whiteside on February 7 (two days after

the complaint). Dkt. No. 37-3 at 112:24–113:2; Dkt. No. 32-6 at 9; Dkt. No. 37-6 at 74; Dkt. No. 37-5 at 86. This quick succession of events in combination with information about the contents of the various parties' communications creates an inference of a causal connection between Whiteside's complaint and Staples's decision to terminate him.

Defendants respond that Whiteside presents no circumstantial evidence of Staples's knowledge, only speculation. "[A] jury finding that a decisionmaker was aware of an employee's protected conduct 'must be supported by reasonable inferences from the evidence, not mere speculation.'" Martin, 959 F.3d at 1053 (citing Clover, 176 F.3d at 1355). "'[U]nrebutted evidence that the decision maker did not have knowledge' of the employee's protected conduct means that 'temporal proximity alone is insufficient to create a genuine issue of fact as to causal connection.'" Id. at 1054 (quoting Brungart, 231 F.3d at 799).

In Martin, the direct evidence—the decisionmaker's testimony that he did not know about the plaintiff's discrimination complaint—showed only that the decisionmaker was unaware that the plaintiff complained of discrimination.  Id. at 1054. Because there was direct evidence that the decisionmaker lacked knowledge, the Eleventh Circuit determined that the temporal proximity of the plaintiff's complaint and her termination was "not enough to put [the decisionmaker's denial of knowledge] in doubt." Id. However,

36

the plaintiff could still avoid summary judgment by presenting "any other evidence" of the decisionmaker's knowledge or evidence that impeached the decisionmaker's denial of knowledge. Id.

The Martin plaintiff presented evidence that (1) she complained to an HR employee; (2) the HR employee emailed the decisionmaker the next day, informing the decisionmaker that the plaintiff met with her and "talked about her frustration with what she perceived as being targeted for criticism"; and (3) the HR employee met with the decisionmaker to discuss the plaintiff. Id. at 1050–51. Both the HR employee and the decisionmaker denied discussing the plaintiff's discrimination complaint—instead they testified that they discussed the decisionmaker's frustration with the plaintiff. Id. According to the court, the circumstantial evidence demonstrated that the HR employee had an "*opportunity*" to tell the decisionmaker that the plaintiff engaged in protected activity, "*but not that she actually did*." Id. at 1054 (emphasis added). Furthermore, the plaintiff presented impeachment evidence regarding when the decisionmaker decided to fire the plaintiff. Id. at 1056. The Court dismissed its relevance because none of the impeachment evidence was "related to the only legally relevant question: whether [the decisionmaker] knew of [the plaintiff's] protected activity at the time he took adverse action against her." Id.

Similarly, in Clover, the plaintiff participated in a sexual harassment investigation of a supervisor, Pettis, and was fired shortly thereafter. 176 F.3d at 1348–49. The plaintiff presented evidence that (1) the decisionmaker "was Pettis' friend and manager"; (2) "prior to his decision to terminate [the plaintiff], [the decisionmaker] knew Pettis had been investigated about something, but did not know the details"; and (3) the decisionmaker spoke with an HR employee, "at some point after [the plaintiff] participated in the investigation on March 23 but before [the decisionmaker] informed [the plaintiff] she was being terminated March 24." Id. at 1354. As in Martin, the court found insufficient circumstantial evidence that the decisionmaker knew about the plaintiff's complaint. Id. at 1355. The court noted that the meeting between the decisionmaker and the HR employee showed, at most, that the HR employee "could conceivably have told" the decisionmaker about the plaintiff's participation. Id. The court explained, "because 'could have told' is not the same as 'did tell,' it would be pure speculation to infer that [the HR employee] actually told [the decisionmaker] about [the plaintiff's] participation." Id.[2]

---

[2] Whiteside takes issue with Eleventh Circuit precedent surrounding Clover, 176 F.3d at 1346, Goldsmith, 996 F.2d at 1164, and Weaver v. Casa Gallardo, Inc., 922 F.2d 1515, 1528 (11th Cir. 1991). Dkt. No. 42 at 5–6. Because Eleventh Circuit precedent is binding upon the Court and the Court finds in Whiteside's favor on the issue of causation, the Court will not address the merits of this argument.

As in Martin, the only direct evidence in this case is Staples and Smith's testimony that they did not know about the complaint and Elliott's testimony that the complaint did not occur. Dkt. No. 32-8 ¶ 15; Dkt. No. 37-5 at 39:5–11, 41:20–42:6; Dkt. No. 37-6 at 38:4–9, 38:21–40:1. Unlike in Clover and Martin, Whiteside's theory requires inferences about the contents of two conversations—whether Elliott told Smith about Whiteside's complaint and whether Smith told Staples. Due to the timing of the various conversations, Elliott had the *opportunity* to tell Smith and Smith had the *opportunity* to tell Staples about Whiteside's complaint. But Whiteside presents more evidence than temporal proximity.

First, Whiteside presents impeachment evidence related to the legally relevant question: whether Staples knew about Whiteside's protected activity at the time he fired Whiteside. Martin, 959 F.3d at 1057. Here, Whiteside presents evidence that impeaches Elliott's testimony that she did not speak to Smith the day of Whiteside's complaint, which indicates that Elliot had the *opportunity* to tell Smith. Dkt. No. 37-6 at 36:15–37:19; Dkt. No. 37-5 at 78. Further, less than a full day passed between Elliott's call to Smith and Smith's email to Staples indicating he had *new* information about Whiteside. Dkt. No. 37-3 at 112:24–113:2; Dkt. No. 32-6 at 9; Dkt. No. 37-7 at 72. The timing and the content of

Smith's email raises the reasonable inference that Elliott *actually told* Smith about the complaint.

Next, in <u>Clover</u> and <u>Martin</u>, the plaintiffs produced no evidence that indicated what the HR employee and the decisionmaker discussed during their meetings. In contrast, Whiteside presents evidence that indicates what Elliott and Smith as well as Smith and Staples discussed: (1) the timing of the complaint, communications, and Whiteside's termination, and (2) the email stating that Smith had *new* information about Whiteside to tell Staples.

Although it is a very close case, there is enough information that it would be possible for a reasonable jury to infer from the timing and the content of the email that the "update" Smith needed to provide was about Whiteside's complaint. <u>See</u> <u>supra</u> p. 34. Phrased differently, the evidence indicates more than just that Elliott had the *opportunity* to tell Smith and that Smith had the *opportunity* to tell Staples about Whiteside's complaint. Instead, by a hair, it raises a plausible inference that Elliott *actually* told Smith and Smith *actually* told Staples because Smith indicated he had something new to tell Staples about Whiteside. It is also entirely plausible, if not probable, that Elliott and Smith discussed an unrelated matter or that—like the HR employee in <u>Martin</u>—Smith told Staples that Whiteside was upset about his

treatment, not that Whiteside had lodged a race discrimination complaint. This is therefore a genuine dispute of material fact.

Whiteside also argues that "a jury could reasonably infer that Elliott was the decisionmaker in this case," which shows that the decisionmaker was aware of Whiteside's protected activity. Dkt. No. 42 at 6. While Elliott may be a decisionmaker, this argument is superfluous because the Court has found that a genuine dispute as to knowledge exists. See also Standard v. A.B.E.L. Servs., Inc., 161 F.3d 1318, 1333 (11th Cir. 1998) (finding that an employee was a non-decisionmaker because there was no evidence that he was involved in the decision to fire the plaintiff and there was no evidence he even spoke to the plaintiff). Further, this argument ignores that a situation may involve multiple decisionmakers. Cf. Robertson v. Riverstone Communities, LLC, 849 F. App'x 795, 799, 802, 807 (11th Cir. 2021) (noting that a supervisor was not the "primary," "sole," or "ultimate" decisionmaker where the supervisor, regional manager, director of human resources, and director of property management all decided together to terminate the plaintiff); Wright v. Southland Corp., 187 F.3d 1287, 1304 (11th Cir. 1999) (recognizing two "relevant decisionmakers" in the case).

Even assuming Elliott was *a* decisionmaker, the evidence is undisputed that Staples was the *ultimate* decisionmaker. Staples had the authority and made the decision to fire Staples. Dkt. No.

32-8 ¶ 11 ("[W]hen the PIP expired, I[, Staples,] made the decision to terminate [Whiteside]."); Dkt. No. 37-7 at 10:20-21 ("So I as the general manager, I have the authority to terminate whomever I deem."). Staples consulted Elliott and Smith about disciplinary actions he had taken to see whether he was acting correctly "from a legal ethical moral standpoint," not to "ask[] them for permission" to fire anyone. Dkt. No. 37-7 at 10:5-11:4. Whiteside points to no evidence indicating that Elliott had the authority to fire Whiteside or overrule Staples's decision to fire him. See generally Dkt. No. 37; Dkt. No. 42; see also Clover, 176 F.3d at 1356 (holding that a human resources employee was not an additional decisionmaker because she did not have the authority to decide to terminate the plaintiff or to overrule the senior vice-president's decision to terminate the plaintiff). Thus, finding that Elliott was also a decisionmaker does not change the Court's analysis regarding knowledge.

Because Whiteside has presented evidence creating genuine issues of material fact whether "[1] he engaged in statutorily protected activity, [2] he suffered a materially adverse action, and [3] there was some causal relation between the two events," Whiteside has provided enough evidence to make out a prima facie case of retaliation. Goldsmith, 513 F.3d at 1277. So now, the burden of production shifts to Defendants to rebut it. Gogel, 967 F.3d at 1135. Defendants articulate and support a legitimate, non-

discriminator reason for Whiteside's termination: his poor performance and his PIP's expiration. Dkt. No. 32-8 ¶ 11. The Court must therefore examine whether this proffered reason is pretext.

### C. Whiteside cannot show that Defendants' explanation is pretext.

A plaintiff may prove pretext for a retaliation claim in a similar manner by which she proves pretext for a discrimination claim. As with a discrimination claim, provided the defendant's proffered non-discriminatory explanation "is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it." Gogel, 967 F.3d at 1136 (alterations accepted) (quoting Chapman, 229 F.3d at 1030). To do so, "a plaintiff must demonstrate 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence.'" Id. (quoting Jackson, 405 F.3d at 1289). However, unlike a discrimination claim, "[a] reason is not pretext for retaliation 'unless it is shown *both* that the reason was false, *and* that retaliation was the real reason.'" Id. (alterations accepted) (quoting Springer, 509 F.3d at 1349). Ultimately, the plaintiff bears the "burden to provide evidence from which one could reasonably conclude that *but for* her alleged protected act, her employer would not have fired her." Id.

43

A prefatory note: Whiteside argues that he has "set forth a 'convincing mosaic of circumstantial evidence' proving the adverse employment actions were because of the protected activity and Defendants' justifications are pretextual." Dkt. No. 37 at 15. The Eleventh Circuit has "not held, in a published opinion, that the 'convincing mosaic theory' is appliable in Title VII retaliation cases," Hampton v. Amedisys Georgia, LLC, No. 22-11275, 2023 WL 152193, at *4 (11th Cir. Jan. 11, 2023), and Whiteside cites no authority holding that it is applicable for Section 1981 retaliation cases, see generally Dkt. No. 37. Further, the "convincing mosaic theory" provides another avenue for a plaintiff to survive summary judgment, rather than for a plaintiff to specifically show pretext. See, e.g., Hampton, 2023 WL 152193, at *4 ("A plaintiff can also survive summary judgment if she presents 'a convincing mosaic of circumstantial evidence' that raises a reasonable inference that her employer intentionally discriminated against her." (quoting Smith, 644 F.3d at 1328)); Jenkins, 26 F.4th at 1250 ("Aside from the McDonnell Douglas framework, an employee can still survive summary judgment by presenting 'circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent.'" (quoting Smith, 644 F.3d at 1328)). Whiteside, however, frames this "convincing mosaic" comment in the context of showing pretext. Dkt. No. 37 at 15-19. Even assuming the "convincing mosaic" framework applies to Section 1981

retaliation claims, Whiteside's claim fails because he has not shown pretext.

In this case, Staples testified that Whiteside failed to meet his PIP goals and his PIP expired, so Staples terminated Whiteside. Dkt. No. 32-8 ¶ 11. Whiteside, however, cannot show that Staples's proffered reason for firing him was false—that but-for Whiteside's complaint, Staples would not have fired him. Therefore, even if Whiteside could show that retaliation motivated Staples's decision, Whiteside fails to show pretext. Gogel, 967 F.3d at 1136 (requiring a plaintiff show "*both* that the reason was false, *and* that retaliation was the real reason*" (alterations accepted) (quoting Springer, 509 F.3d at 1349)).

For the reasons discussed when evaluating pretext for Whiteside's discrimination claim, supra pp. 20-25, Whiteside's evidence and arguments relating to how well he performed his job or the unfairness of the PIP procedure do not contribute to the inference that Defendants' explanation is pretext. Instead, the evidence in this case supports Defendants' explanation that Staples was unhappy with Whiteside's job-performance—Staples documented his continued disappointment with Whiteside's performance at the end of each week that Whiteside was under PIP review. Dkt. No. 32-5 at 15-18. Staples documented his dissatisfaction with Whiteside's performance for five weeks *before* Whiteside ever lodged his complaint and continued documenting his

dissatisfaction weekly until Whiteside's termination. Id. (including comments from "week 1" through "week 5" of Whiteside's review period). This evidence indicates that even if Whiteside had not lodged a complaint, Whiteside would still have fired him due to his poor performance.

Whiteside does not present evidence to undermine this conclusion. The timing and the disputes about whether the PIP expired and when Staples decided to terminate Whiteside do not indicate that Staples was subjectively *satisfied* with Whiteside's performance. In other words, it does not show that his proffered explanation was *false*. Crediting Whiteside's testimony that he and Staples discussed the PIP objectives' fluidity rather than the PIP expiring, such testimony indicates at most that Staples's decision was *unfair*, not that Staples's proffered dissatisfaction with Whiteside's performance is *dishonest*. Thus, a reasonable factfinder could not conclude that but for Whiteside's complaint, Staples would not have fired him. As such, Whiteside fails to show pretext and his retaliation claim fails.

Even if the Court accepted Whiteside's invitation to stack inference upon inference—inferring that the incongruous dates on the last pages of Whiteside's PIP meant that his PIP did not expire; that the timing of Defendants' communications is suspicious; that Whiteside complained of race discrimination to Elliott; that Elliott told Smith about Whiteside's complaint

46

because she contacted Smith shortly after speaking to Whiteside; that Smith's email about an "update" about Whiteside meant that Smith told Staples about Whiteside's race discrimination complaint; and that Staples had not already decided to terminate Whiteside at that time—and found that retaliation could have motivated Staples's decision, Whiteside's claim would still fail because he cannot show that Defendants' proffered explanation is false. Gogel, 967 F.3d at 1136. Defendants' motion for summary judgment is therefore **GRANTED** as to Plaintiff's Section 1981 retaliation claim.

**CONCLUSION**

Because Plaintiff fails to present direct evidence of discrimination, fails to satisfy the McDonnell Douglas framework, and fails to demonstrate a "convincing mosaic" of circumstantial evidence of discrimination, Defendants' motion for summary judgment, dkt. no. 32, is **GRANTED** as to Plaintiff's Section 1981 race discrimination claim. Plaintiff also failed to produce sufficient evidence to create a genuine issue of material fact as to pretext for his Section 1981 retaliation claim. Thus, Defendants' motion for summary judgment, id., is **GRANTED** as to Plaintiff's Section 1981 retaliation claim. There being no claims remaining in this action, the Clerk is **DIRECTED** to **CLOSE** this case.

**SO ORDERED** this 5th day of April, 2023.

_____

HON. LISA GODBEY WOOD, JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA